# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| LAN HUONG TRAN, derivatively on behalf of UNITED PARCEL SERVICE, INC., <br><br>     Plaintiff, <br><br>        v. <br><br> CAROL B. TOME, BRIAN O. NEWMAN, NANDO CESARONE, RODNEY ADKINS, EVA BORATTO, MICHAEL BURNS, WAYNE HEWETT, ANGELA HWANG, KATE JOHNSON, WILLIAM JOHNSON, FRANCK MOISON, CHRISTIANA SMITH SHI, RUSSELL STOKES, and KEVIN WARSH, <br><br>     Defendants, <br><br>       and <br><br> UNITED PARCEL SERVICE, INC., <br><br>     Nominal Defendant. | Case No: <br><br><br><br><br><br><br><br><br><br><br> **JURY TRIAL DEMANDED** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Lan Huong Tran ("Plaintiff"), by Plaintiff's undersigned attorneys,

derivatively and on behalf of nominal defendant United Parcel Service, Inc.

("UPS" or the "Company"), files this Verified Shareholder Derivative Complaint

against defendants Carol B. Tome ("Tome"), Brian O. Newman ("Newman"), Nando Cesarone ("Cesarone"), Rodney Adkins ("Adkins"), Eva Boratto ("Boratto"), Michael Burns ("Burns"), Wayne Hewett ("Hewett"), Angela Hwang ("Hwang"), Kate Johnson ("K. Johnson"), William Johnson ("W. Johnson"), Franck Moison ("Moison"), Christiana Smith Shi ("Shi"), Russell Stokes ("Stokes"), and Kevin Warsh ("Warsh") (collectively, the "Individual Defendants," and together with UPS, "Defendants") for violations of Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act"), breaches of their fiduciary duties as directors and/or officers of UPS, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for contribution under Sections 10(b) and 21D of the Exchange Act against Defendants Tome, Newman, and Cesarone.

As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and

regarding UPS, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from January 30, 2024 to July 22, 2024, both dates inclusive (the "Relevant Period").

2.     UPS represents itself to be the "world's premier package delivery company and a leading provider of global supply chain management solutions."[1] The Company purports to "offer a broad range of industry-leading products and services through [its] extensive global presence" and represents that its services "include transportation and delivery, distribution, contract logistics, ocean freight, air freight, customs brokerage and insurance."[2]

3.     The Relevant Period began on January 30, 2024 when the Company issued a press release announcing its financial results for the fourth quarter and full 2023 year. The press release announced that "[f]or the full year 2024, UPS expects

[1]https://www.sec.gov/ix?doc=/Archives/edgar/data/1090727/000109072724000018/ups-20240318.htm
[2] *Id.*

revenue to range from approximately $92.0 billion to $94.5 billion and consolidated adjusted operating margin to range from approximately 10.0% to 10.6%." It also represented that UPS was "planning capital expenditures of about $4.5 billion and dividend payments of around $5.4 billion, subject to board approval" with the "effective tax rate [] expected to be around 23.5%."

4.     Throughout the Relevant Period, Defendants touted UPS's volume growth, price discipline, cost execution, and ability to handle volume variabilities. However, in reality, the Company was not truly equipped to handle a surge in volume in lower-profit services without seeing a significant decline in its operating margins.

5.     The truth emerged on July 23, 2024 when the Company announced its financial results for the second quarter of 2024, provided lower-than-expected guidance for the third quarter, and reduced UPS's margin guidance for the full fiscal year 2024. UPS stated that these results and the Company's lowered guidance could be tied to the shift in "U.S. volume mix both in terms of product and customer segmentation . . . toward value products."

6.     On this news, the price per share of UPS's stock fell $17.50, or approximately 12%, from a closing price of $145.18 per share on July 22, 2024 to close at a price of $127.68 per share on July 23, 2024.

7.      Throughout the Relevant Period, the investing public was under a false impression of the Company's business, operations, financial success, and growth. Specifically, the Individual Defendants breached their fiduciary duties by willfully or recklessly making and/or causing the Company to make false and misleading statements to the investing public which failed to disclose, *inter alia*, that: (1) Defendants did not have reliable information with respect to the Company's projected revenue outlook and anticipated growth; (2) Defendants were minimizing the risks facing the Company as a result of seasonality and macroeconomic fluctuations; and (3) UPS was not equipped to handle a volume surge without causing a related substantial decline in the Company's operating margin. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

8.      The Individual Defendants breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

9.      In breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls.

10.     In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), its former Chief

Financial Officer ("CFO"), and its Executive Vice President ("EVP") and President to a federal securities class action lawsuit pending in the United States District Court for the Northern District of Georgia (the "Securities Class Action"), and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

11.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

12.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of Defendant Tome's, Newman's, and Cesarone's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to

commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## **JURISDICTION AND VENUE**

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

14.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

16.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

17.    Plaintiff is a current shareholder of UPS. Plaintiff has continuously held UPS common stock since first purchasing the stock on December 30, 2021.

### Nominal Defendant UPS

18.    Nominal Defendant UPS is a Delaware corporation with its principal executive offices at 55 Glenlake Parkway, N.E., Atlanta, Georgia 30328. UPS's common stock trades on the New York Stock Exchange ("NYSE") under ticker symbol "UPS."

### Defendant Tome

19.    Defendant Tome has served as the Company's CEO since June 2020 and as a Company director since 2003. She also serves as a member of the Executive Committee. According to the Schedule 14A the Company filed with the SEC on March 18, 2024 (the "2024 Proxy Statement"), as of March 1, 2024, Defendant Tome beneficially owned 399,689 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2024 was $148.06, Defendant Tome owned approximately $59.2 million worth of UPS stock as of that date.

20.    For the fiscal year ended December 31, 2023 (the "2023 Fiscal

Year"), Defendant Tome received $23,390,051 in total compensation from the Company. This included $1,509,713 in salary, $18,916,192 in stock awards, $1,358,762 in option awards, $1,509,713 in non-equity incentive plan compensation, and $95,671 in all other compensation.

21.    The 2024 Proxy Statement stated the following about Defendant Tome:

**Career**

Carol was appointed UPS's Chief Executive Officer effective June 2020. As CEO, Carol has primary responsibility for managing the Company's day-to-day operations, and for developing and communicating our strategy. She was Chief Financial Officer of The Home Depot, Inc., one of the world's largest retailers, from 2001; and Executive Vice President Corporate Services from 2007 until her retirement in 2019. At The Home Depot, she provided leadership in the areas of real estate, financial services and strategic business development. Her corporate finance duties included financial reporting and operations, financial planning and analysis, internal audit, investor relations, treasury and tax. She previously served as Senior Vice President Finance and Accounting and Treasurer from 2000 until 2001; and from 1995 until 2000 she served as Vice President and Treasurer. Carol serves on the Board of Directors of Verizon Communications, Inc. and served on the Board of Directors of Cisco Systems, Inc. until 2020.

**Reasons for election**

Carol has a thorough understanding of our strategies and operations as a result of serving as Chief Executive Officer, and from her extensive experience gained from serving on the board and as Chair of the Audit Committee prior to becoming Chief Executive Officer. She has an in-depth knowledge of logistics and has broad experience in corporate finance and risk and compliance gained throughout her career at The Home Depot. She brings the experience of having served as Chief

Financial Officer of a complex, multi-national business with a large, labor intensive workforce. Carol also has experience with strategic business development, including e-commerce strategy.

**Defendant Newman**

22.    Defendant Newman served as the Company's CFO from 2019 until June 1, 2024. According to the 2024 Proxy Statement, as of March 1, 2024, Defendant Newman beneficially owned 113,818 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2024 was $148.06, Defendant Newman owned approximately $16.9 million worth of UPS stock as of that date.

23.    For the 2023 Fiscal Year, Defendant Newman received $7,342,070 in total compensation from the Company. This included $831,626 in salary, $5,551,095 in stock awards, $406,692 in option awards, $481,692 in non-equity incentive plan compensation, and $70,965 in all other compensation.

**Defendant Cesarone**

24.    Defendant Cesarone has served as the Company's EVP & President since March 2022. He previously served as the Company's President USA from August 2020 to March 2022 and as the Company's President International from March 2018 to August 2020. According to the 2024 Proxy Statement, as of March 1, 2024, Defendant Cesarone beneficially owned 67,209 shares of the Company's

common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2024 was $148.06, Defendant Cesarone owned approximately $10 million worth of UPS stock as of that date.

25.    For the 2023 Fiscal Year, Defendant Cesarone received $6,521,241 in total compensation from the Company. This included $840,254 in salary, $4,686,065 in stock awards, $407,924 in option awards, $487,837 in non-equity incentive plan compensation, and $99,161 in all other compensation.

26.    The Company's website states the following about Defendant Cesarone:

> Nando Cesarone serves as Executive Vice President (EVP) and President U.S. A member of the company's Executive Leadership Team, he oversees the U.S. small package, transportation and airline business units, as well as sustainability and the company's automotive and global buildings and systems engineering groups.

> In his prior role, Nando served as President of U.S. Operations, responsible for UPS operations for the world's largest economy. Earlier in his career, Nando was the President of UPS International, leading the company's business operations in more than 220 countries and territories outside of the U.S. He also served as president of UPS's Europe region. While there, he led the business unit to record business performance during the company's five-year investment program into the region's technology, network and infrastructure, which was designed to further improve speed, capacity and reliability.

> Before his assignment as President of UPS Europe, Nando served as President of the Asia Pacific region. While in Asia, he expanded UPS's presence in vital emerging markets and China. He led strategic projects

to accelerate intra-Asia transit times for key trade lanes connecting growth markets and launched new products including Trade Management Services, and China-to-Europe rail freight.

Nando received an MBA from Heriot Watt University - Edinburgh School of Business. He started his career as a UPS preloader in 1990 as part of UPS's tuition reimbursement program while attending York University and before becoming a package car driver.

**Defendant Adkins**

27.    Defendant Adkins has served as a Company director since 2013. He also serves as Chair of the Risk Committee and as a member of the Compensation and Human Capital Committee and the Executive Committee. According to the 2024 Proxy Statement, as of March 1, 2024, Defendant Adkins beneficially owned 19,844 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2024 was $148.06, Defendant Adkins owned approximately $2.9 million worth of UPS stock as of that date.

28.    For the 2023 Fiscal Year, Defendant Adkins received $316,125 in total compensation from the Company, which consisted of $136,250 in fees earned or paid in cash and $179,875 in stock awards.

29.    The 2024 Proxy Statement stated the following about Defendant Adkins:

**Career**

Rod is President of 3RAM Group LLC, a private company specializing in capital investments, business consulting and property management services. Prior to that role, Rod served as IBM's Senior Vice President of Corporate Strategy before retiring in 2014. Rod was previously IBM's Senior Vice President, Systems and Technology Group, a position he held since 2009, and senior vice president of STG development and manufacturing, a position he held since 2007. In his over 30-year career with IBM, a multinational technology company, Rod held several other development and management roles, including general management positions for the PC Company, UNIX Systems and Pervasive Computing. Rod currently serves as non-executive Chairman of Avnet, Inc., in addition to serving on the Boards of Directors of PayPal Holdings, Inc. and W.W. Grainger, Inc. He retired from the Board of Directors of PPL Corporation in 2019.

**Reasons for election**

As a senior executive of a public technology company, Rod gained a broad range of experience, including in emerging technologies and services, global business operations, and supply chain management. He remains a recognized leader in technology and technology strategy. Rod devotes significant time and attention to his roles as a board member and Risk Committee Chair. In addition, the board benefits from Rod's experience serving as a director of other publicly traded companies.

**Defendant Boratto**

30.    Defendant Boratto has served as a Company director since 2020. She also serves as Chair of the Audit Committee. According to the 2024 Proxy Statement, as of March 1, 2024, Defendant Boratto beneficially owned 3,904 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2024 was $148.06,

- 13 -

Defendant Boratto owned approximately $578,026 worth of UPS stock as of that date.

31.    For the 2023 Fiscal Year, Defendant Boratto received $321,125 in total compensation from the Company, which consisted of $141,250 in fees earned or paid in cash and $179,875 in stock awards.

32.    The 2024 Proxy Statement stated the following about Defendant Boratto:

**Career**

Eva has served as the Chief Financial Officer of Bath & Body Works, Inc., a leader in personal care and home fragrances, since August 2023. She previously served as the Chief Financial Officer for Opentrons Labworks, Inc., a privately held life sciences company, from February 2022 until July 2023.

Eva served as Executive Vice President and Chief Financial Officer for CVS Health Corporation, a diversified health services company, from 2018 until her retirement in 2021. In this role, Eva was responsible for all aspects of the company's financial strategy and operations, including accounting and financial reporting, investor relations, mergers and acquisitions, treasury and capital planning, investments, risk management, tax, budgeting and planning, and procurement. Prior to this role, from 2017 to 2018, Eva was Executive Vice President, Controller and Chief Accounting Officer for CVS Health. She served as Senior Vice President and Chief Accounting Officer of CVS Health from 2013 to 2017. Eva joined the company in 2010 and served as Senior Vice President for pharmacy benefit management finance until 2013.

**Reasons for election**

Eva brings to the board extensive corporate finance experience gained throughout her career as a Chief Financial Officer at multiple companies. She also brings the experience of having served as a

senior executive at a complex healthcare business with a large workforce and extensive retail presence, and at a smaller, growth oriented business, including deep knowledge of financial reporting and accounting standards. Eva also provides the board with the benefits of her experience with strategic risk management matters.

**Defendant Burns**

33.    Defendant Burns has served as a Company director since 2005. He also serves as a member of the Audit Committee. According to the 2024 Proxy Statement, as of March 1, 2024, Defendant Burns beneficially owned 37,042 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2024 was $148.06, Defendant Burns owned approximately $5.5 million worth of UPS stock as of that date.

34.    For the 2023 Fiscal Year, Defendant Burns received $296,125 in total compensation from the Company, which consisted of $116,250 in fees earned or paid in cash and $179,875 in stock awards.

35.    The 2024 Proxy Statement stated the following about Defendant Burns:

**Career**
Mike was the Chairman, President and Chief Executive Officer of Dana Incorporated, a global manufacturer of technology driveline, sealing and thermal-management products, from 2004 until his retirement in 2008. He joined Dana Incorporated in 2004 after 34 years

with General Motors Company. During his tenure at General Motors, Mike held various positions of increasing responsibility, including serving as President of General Motors Europe AG from 1998 to 2004.

**Reasons for election**

Mike has years of senior leadership experience gained while managing large, complex businesses and leading an international organization that operated in a highly competitive industry. He also has experience in design, engineering, manufacturing, and sales and distribution. Mike also brings deep knowledge of technology and the supply of components and services to major vehicle manufacturers.

**Defendant Hewett**

36.    Defendant Hewett has served as a Company director since 2020. He also serves as a member of the Audit Committee. According to the 2024 Proxy Statement, as of March 1, 2024, Defendant Hewett beneficially owned 4,772 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2024 was $148.06, Defendant Hewett owned approximately $706,542 worth of UPS stock as of that date.

37.    For the 2023 Fiscal Year, Defendant Hewett received $296,125 in total compensation from the Company, which included $116,250 in fees earned or paid in cash and $179,875 in stock awards.

38.    The 2024 Proxy Statement stated the following about Defendant Hewett:

- 16 -

**Career**

Since 2018, Wayne has served as a senior advisor to Permira, a global private equity firm. As a part of his role at Permira, Wayne serves in the following capacities at Permira Funds private portfolio companies: Non-Executive Chairman of Cambrex Corporation, a leading contract developer and manufacturer of active pharmaceutical ingredients, since 2020; director of Lytx, a telematics solutions provider, since 2021; as lead director of Hexion Chemicals, a specialty chemicals and performance materials manufacturer, since 2023; and as Non-Executive Chairman of Quotient Sciences, a drug development accelerator, since 2023.

Wayne served as Chief Executive Officer and as a member of the Board of Directors of Klöckner Pentaplast Group, a leading supplier of plastic films for pharmaceutical, medical devices, food and other specialty applications, from 2015 to 2017. He also served as President and as a member of the Board of Directors, of Platform Specialty Products Corporation during 2015, and as President, Chief Executive Officer and as a member of the Board of Directors of Arysta LifeScience Corporation from 2010 to 2015. Arysta was acquired in 2015 by Platform Specialty Products Corporation. Prior to joining Arysta, he served as a senior consultant to GenNx360, a private equity firm focused on sponsoring buyouts of middle market companies. He also spent over two decades at General Electric Company, serving in a variety of executive roles. Wayne currently serves on the Boards of Directors of The Home Depot, Inc. and Wells Fargo, Inc.

**Reasons for election**

Wayne has extensive experience in general management, finance, supply chain, operational and international matters gained through serving in various executive roles. He has significant experience executing company-wide initiatives across large organizations, developing proprietary products, optimizing supply chains, and using emerging technologies to provide new products and services. He brings insights on business operations and risk management through his senior management roles. In addition, Wayne has valuable experience serving as a director of other publicly traded companies.

**Defendant Hwang**

39.     Defendant Hwang has served as a Company director since 2020. She also serves as a member of the Audit Committee. According to the 2024 Proxy Statement, as of March 1, 2024, Defendant Hwang beneficially owned 4,268 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2024 was $148.06, Defendant Hwang owned approximately $631,920 worth of UPS stock as of that date.

40.     For the 2023 Fiscal Year, Defendant Hwang received $296,125 in total compensation from the Company, which included $116,250 in fees earned or paid in cash and $179,875 in stock awards.

41.     The 2024 Proxy Statement stated the following about Defendant Hwang:

> **Career**
> Angela serves as an advisor to Pfizer, Inc., a multinational pharmaceutical and biotechnology company, as that company undertakes changes in its commercial organization following the completion of an acquisition. She was a member of Pfizer's Executive Team from 2018 to 2023 and served as Chief Commercial Officer and President of Pfizer's Global Biopharmaceuticals Business from 2019 to 2023. In this role, Angela led Pfizer's entire commercial business which included six different businesses reaching patients in more than 185 countries.

During 2018 she served as Group President, Pfizer Essential Health; and from 2016 to 2018 she was Global President Pfizer Inflammation and Immunology. From 1997 until that time, Angela served in various roles with increasing responsibility across all geographies and therapeutic areas, including senior roles in Pfizer Vaccines, Primary Care, and Emerging Markets.

Angela sits on the board of advisors of the Cornell Johnson School of Management.

**Reasons for election**

Angela has significant expertise in the healthcare sector and in managing large complex businesses, including supply chain management and logistics. She also has experience in emerging markets gained through her work across many geographies. Angela is also a strong advocate for women's leadership and sustainable global health equity.

### **Defendant K. Johnson**

42.    Defendant K. Johnson has served as a Company director since 2020. She also serves as a member of the Risk Committee and the Nominating and Corporate Governance Committee. According to the 2024 Proxy Statement, as of March 1, 2024, Defendant K. Johnson beneficially owned 3,577 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2024 was $148.06, Defendant K. Johnson owned approximately $529,610 worth of UPS stock as of that date.

43.    For the 2023 Fiscal Year, Defendant K. Johnson received $296,125 in total compensation from the Company, which included $116,250 in fees earned or paid in cash and $179,875 in stock awards.

44. The 2024 Proxy Statement stated the following about Defendant K. Johnson:

**Career**

Kate has served as President, CEO and a member of the board of directors of Lumen Technologies, Inc., a multinational technology company that integrates network assets, cloud connectivity, security solutions and voice and collaboration tools into one platform for businesses, since November 2022. Previously, Kate served as President of Microsoft U.S., a division of Microsoft Corporation, from 2017 until 2021. She had responsibility for Microsoft's U.S. activities, including growing the company's solutions, services, and support revenues.

Prior to Microsoft, she held various senior positions with GE, including Executive Vice President and Chief Commercial Officer GE Digital, from 2016 to 2017; Chief Executive Officer, GE Intelligent Platforms Software from 2015 to 2016; and Vice President and Chief Commercial Officer, from 2013 to 2015.

**Reasons for election**

Kate has significant public company leadership experience, including CEO experience and experience leading businesses within large companies undergoing transformation, large systems companies, and technology companies. The board benefits from her strong commercial orientation, strategic experience and technical acumen.

## **Defendant W. Johnson**

45. Defendant W. Johnson has served as a Company director since 2009. He also serves as Chair of the Nominating and Corporate Governance Committee and as a member of the Executive Committee. According to the 2024 Proxy Statement, as of March 1, 2024, Defendant W. Johnson beneficially owned 35,005 shares of the Company's common stock. Given that the price per share of the

Company's common stock at the close of trading on March 1, 2024 was $148.06, Defendant W. Johnson owned approximately $5.2 million worth of UPS stock as of that date.

46.    For the 2023 Fiscal Year, Defendant W. Johnson received $546,134 in total compensation from the Company, which included $296,250 in fees earned or paid in cash and $249,884 in stock awards.

47.    The 2024 Proxy Statement stated the following about Defendant W. Johnson:

**Career**

Bill currently serves as UPS's Board Chair, and previously served as Chairman, President and Chief Executive Officer of H.J. Heinz Company, a global packaged foods manufacturer, from 2000 until his retirement in 2013. He became President and Chief Operating Officer of H.J. Heinz in 1996, and assumed the position of President and Chief Executive Officer in 1998. Bill serves on the Board of Directors of Sovos Brands, Inc. and he previously served on the Board of Directors of PepsiCo, Inc. until 2020.

**Reasons for election**

Bill has significant senior management experience gained through his years of service as the Chairman and Chief Executive Officer of H.J. Heinz, a corporation with significant international operations and a large, labor intensive workforce. He also has deep experience in operations, marketing, brand development and logistics. He served as our lead independent director from 2016 to 2020, and he has served as our independent Board Chair since 2020, during which time he has gained significant knowledge and expertise about our board functions, operations, business and strategy.

**Defendant Moison**

48.     Defendant Moison has served as a Company director since 2017. He also serves as a member of the Nominating and Corporate Governance Committee and the Risk Committee. According to the 2024 Proxy Statement, as of March 1, 2024, Defendant Moison beneficially owned 11,396 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2024 was $148.06, Defendant Moison owned approximately $1.7 million worth of UPS stock as of that date.

49.     For the 2023 Fiscal Year, Defendant Moison received $296,125 in total compensation from the Company, which included $116,250 in fees earned or paid in cash and $179,875 in stock awards.

50.     The 2024 Proxy Statement stated the following about Defendant Moison:

**Career**
Franck was Vice Chairman of the Colgate-Palmolive Company, a global consumer products company, from 2016 until his retirement in 2018. He led Colgate-Palmolive's operations in Asia, South Pacific and Latin America, and he also led Global Business Development. Previously, he was Chief Operating Officer of Emerging Markets from 2010 until 2016, and he was given additional responsibility for Business Development in 2013. Beginning in 1978, Franck served in various management positions with Colgate-Palmolive, including President, Global Marketing, Global Supply Chain & R&D from 2007 to 2010; and President, Western Europe, Central Europe and South

Pacific from 2005 to 2007. He serves on the Boards of Directors of Hanes Brands, Inc. and SES-imagotag in France. He is the Chairman of the International Advisory Board of the EDHEC Business School (Paris, London, Singapore) and is a member of the International Board of the McDonough School of Business at Georgetown University.

**Reasons for election**

Franck brings to the board extensive experience as a senior executive at a large international business. He has deep expertise in consumer product innovation, strategic marketing, acquisitions, and emerging market business development. He is a highly accomplished marketing and operating executive in the global consumer products industry. In addition, the board benefits from his extensive international board experience.

**Defendant Shi**

51.     Defendant Shi has served as a Company director since 2018. She also serves as Chair of the Compensation and Human Capital Committee and as a member of the Risk Committee. According to the 2024 Proxy Statement, as of March 1, 2024, Defendant Shi beneficially owned 9,401 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2024 was $148.06, Defendant Shi owned approximately $1.4 million worth of UPS stock as of that date.

52.     For the 2023 Fiscal Year, Defendant Shi received $306,125 in total compensation from the Company, which included $126,250 in fees earned or paid in cash and $179,875 in stock awards.

53.     The 2024 Proxy Statement stated the following about Defendant Shi:

- 23 -

**Career**

Christiana is the founder and principal at Lovejoy Advisors, LLC, an advisory services firm that assists clients with digitally transforming consumer and retail businesses. She was the President, Direct-to-Consumer, for Nike, Inc., a global apparel company, from 2013 until 2016. From 2012 through 2013, she was Nike's Vice President and General Manager, Global Digital Commerce. She joined Nike in 2010 as Vice President and Chief Operating Officer, Global Direct-to-Consumer. Prior to joining Nike, Christiana spent 24 years at global management consulting firm McKinsey & Company, the last ten as a senior partner. She began her career at Merrill Lynch & Company in 1981 and served in various trading, institutional sales and investment banking roles. Christiana also serves on the Board of Directors of Columbia Sportswear Company. She served on the Boards of Directors of Williams-Sonoma, Inc. until 2019 and Mondelēz International, Inc. until 2023.

**Reasons for election**

Christiana brings to the board substantial experience in digital commerce, global retail operations and helping companies with transformative change. She also provides strong supply chain and cost management expertise in the global consumer industry. She gained experience advising senior executives at consumer companies across North America, Europe, Latin America and Asia on leadership and strategy, and provides extensive public company board experience.

**<u>Defendant Stokes</u>**

54.    Defendant Stokes has served as a Company director since 2020. He also serves as a member of the Compensation and Human Capital Committee and the Nominating and Corporate Governance Committee. According to the 2024 Proxy Statement, as of March 1, 2024, Defendant Stokes beneficially owned 3,977 shares of the Company's common stock. Given that the price per share of the

Company's common stock at the close of trading on March 1, 2024 was $148.06, Defendant Stokes owned approximately $588,835 worth of UPS stock as of that date.

55.    For the 2023 Fiscal Year, Defendant Stokes received $296,125 in total compensation from the Company, which included $116,250 in fees earned or paid in cash and $179,875 in stock awards.

56.    The 2024 Proxy Statement stated the following about Defendant Stokes:

**Career**

Russell is President and Chief Executive Officer, Commercial Engines and Services, GE Aerospace, a world-leading provider of jet engines, components and integrated systems for commercial and military aircraft, and a provider of services to support these offerings. He has served in these roles since July 2022 and is responsible for an industry-leading portfolio of engines and services. Russell previously served as President and CEO of GE Aviation Services from 2020 until 2022, where he was responsible for commercial growth, operating performance and customer experience across its global Overhaul and Repair footprint. Prior to this role, Russell was president and CEO of GE Power Portfolio from 2019 to 2020, GE Power from 2017 to 2019, GE Energy Connections from 2015 to 2017, and GE Transportation from 2013 to 2015. He has held other senior roles at GE Transportation and GE Aviation. Russell joined GE in 1997 as part of GE's Financial Management Program.

**Reasons for election**

During his more than 25-year career at GE, Russell has gained deep finance and operating experience through navigating multiple industries, business segments, and market cycles. He brings to the board extensive experience in transforming businesses by moving

- 25 -

complex business issues into focused, targeted actions for improvement. He also provides experience in developing solutions and technology required to successfully implement business strategies.

**Defendant Warsh**

57.    Defendant Warsh has served as a Company director since 2012. He also serves as a member of the Nominating and Corporate Governance Committee and the Compensation and Human Capital Committee. According to the 2024 Proxy Statement, as of March 1, 2024, Defendant Warsh beneficially owned 22,025 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2024 was $148.06, Defendant Warsh owned approximately $3.3 million worth of UPS stock as of that date.

58.    For the 2023 Fiscal Year, Defendant Warsh received $296,125 in total compensation from the Company, which included $116,250 in fees earned or paid in cash and $179,875 in stock awards.

59.    The 2024 Proxy Statement stated the following about Defendant Warsh:

**Career**
Kevin serves as the Shepard Family Distinguished Visiting Fellow in Economics at Stanford University's Hoover Institution, a public policy think tank, and as a Dean's Visiting Scholar and lecturer at

Stanford's Graduate School of Business. He also serves as partner at Duquesne Family Office LLC and is a member of the Group of Thirty (G30) and the Panel of Economic Advisers of the Congressional Budget Office (CBO). He was a member of the Board of Governors of the Federal Reserve from 2006 until 2011. From 2002 until 2006, Kevin served at the White House as President George W. Bush's special assistant for economic policy and as executive secretary of the National Economic Council. Kevin was previously employed by Morgan Stanley & Co., eventually serving as vice president and executive director of the Mergers and Acquisitions department. He also serves on the Board of Directors of Coupang, Inc.

**Reasons for election**

Kevin offers the board extensive experience in understanding and analyzing the economic environment, the financial marketplace and monetary policy. He has a deep understanding of the global economic and business environment. Kevin also provides the experience of working in the private sector for a leading investment bank gained during his tenure at Morgan Stanley & Co.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

60.    By reason of their positions as officers, directors, and/or fiduciaries of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally.

61.    Each director and/or officer of the Company owes to UPS and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

62.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein or aided and abetted the same.

63.    To discharge their duties, the officers and/or directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

64.    As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants at UPS had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects,

and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

65.    To discharge their duties, the officers and/or directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and/or directors of the Company were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Georgia, and the United States, and pursuant to UPS's own Code of Business Conduct (the "Code of Conduct");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how the Company conducted its operations,

and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of the Company and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that the Company's operations would comply with all applicable laws and the Company's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make

full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

66.    Each of the Individual Defendants further owed to the Company and its shareholders the duty of loyalty requiring that each favor the Company's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

67.    At all times relevant hereto, the Individual Defendants at UPS were the agents of each other and of the Company and were at all times acting within the course and scope of such agency.

68.    Because of their advisory, executive, managerial, and directorial positions with the Company, each of the Individual Defendants had access to adverse, non-public information about the Company.

69.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

70.    In committing the wrongful acts alleged herein, the Individual

Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

71.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

72.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein

occurred under the authority of UPS's board of directors, each of the Individual Defendants who was a director of UPS was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

73.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

74.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and/or of the Company and was at all times acting within the course and scope of such agency.

## UPS'S CODE OF CONDUCT

### *Code of Conduct*

75.    The Company's Code of Conduct purportedly "provides information about [UPS's] standards of integrity and explains [UPS's] legal and ethical responsibilities." The Code of Conduct represents that it is "intended to provide

guidance on [the Company's] responsibilities and to assist in making the correct business decisions."

76.    With respect to the scope of its application, the Code of Conduct states the following, in relevant part:

> The UPS Code of Business Conduct ("Code") sets forth standards of conduct for all of UPS. Throughout the Code, "UPS" is used to refer to the enterprise as a whole, to each person within it, and to any person or entity who represents UPS or any part of the UPS organization, including suppliers, consultants, and third-party representatives. Adherence to the Code is required of all employees and representatives of UPS. The Code is available in various languages on ups.com, UPSers.com, and the Corporate Compliance and Ethics website.

77.    Under a section titled "Our Commitment to Integrity," the Code of Conduct states the following, in relevant part:

> UPS has a long tradition of transforming and adapting to the needs of our customers, but our commitment to integrity remains steadfast. We remain committed to a set of beliefs that guided our founders and their successors, and currently guides employees and representatives of UPS.
>
> It is this commitment that will continue to move us forward.
>
> More than 100 years ago, UPS Founder Jim Casey began building our company by asking retailers for their trust. They entrusted us with their business, and every day, UPS people honored that trust and maintained relationships with customers by acting with integrity. We have preserved this philosophy over the years, and it has become our guiding principle.

- 34 -

Today, UPS employees and representatives continue to uphold our strong brand and the legacy of integrity that Jim started.

This requires us to conduct business fairly, honestly, and ethically.

For our company to survive and remain successful, we must have a sound set of beliefs that serves as the foundation for our decisions and actions. We must remember that our success, reputation, and brand were developed over many years and can be damaged if we do not act responsibly with an uncompromising set of common beliefs.

A commitment to integrity is about creating a climate for continued success. It is about creating an environment where people can make good decisions. It is about doing the right thing in every business situation. By using good judgment and respecting others, UPS's commitment to integrity will endure.

78.    Under a section titled "Accuracy of Records and Reporting," the Code of Conduct states the following, in relevant part:

In our jobs, many of us create or prepare some type of information, such as financial reports, accounting records, business plans, environmental reports, injury and accident reports, expense reports, and time cards. We have an obligation to keep accurate and truthful records, which must be prepared in accordance with our commitment to integrity and must comply with applicable accounting procedures and internal controls. People inside and outside UPS expect these reports to be reliable and properly maintained. These people include employees, shareowners, government representatives, auditors, and the communities in which we operate. No one may deviate from our commitment to manage information accurately and truthfully. Our records are maintained for required periods as defined in the UPS Records Retention Schedule ("Schedule").

Any person with knowledge of an improperly or inaccurately prepared business record is required to report this concern to the company.

Additional information about reporting such a concern is available in the section of this Code titled "Reporting Concerns, Asking Questions, and Voicing Opinions."

Refer to the section of this Code titled "Records Management" and the UPS Records Management Program Guidelines available on the Corporate Compliance and Ethics website.

79.     Under a section titled "Records Management," the Code of Conduct

states the following, in relevant part:

We have established policies and procedures to appropriately manage our records. These records are maintained for required periods as defined in the Schedule. There are requirements to retain our records for the minimum period required by law. In some cases, there may be business reasons to retain records for a period of time beyond that required by law. The Corporate or Region Legal Department also may require that records be kept for potential or pending litigation. We have an obligation to maintain or destroy our records in accordance with the Schedule. Any employee or representative who intentionally destroys our records in violation of the Schedule or intentionally fails to destroy records in accordance with the applicable retention period in the Schedule may be subject to disciplinary action, up to and including dismissal. Any employee or representative with knowledge of failure to follow the prescribed Schedule is required to report this concern to the company.

80.     Under a section titled "Confidential and Proprietary Information," the

Code of Conduct states the following, in relevant part:

Information is a valuable corporate asset that is critical to our success. However, nonpublic information about UPS's business activities is confidential or proprietary. Just as UPS values and protects its own confidential and proprietary information, it is our policy and practice to respect the confidential and proprietary information of others,

including information we may have about our employees, customers, and suppliers.

Because the disclosure of confidential or proprietary information could seriously damage UPS's interests, safeguarding this information is the responsibility of all UPS employees and representatives. If we learn about proprietary or confidential information during the course of employment or relationship with UPS, we should be careful not to share it with others, including other employees, unless they need to know it for a legitimate business reason that will not violate any law, regulation, or UPS policy or procedure.

We may be asked to provide confidential or proprietary information internally or externally. Depending upon the circumstances, this could be a violation of our contractual commitments to our employees, customers, or suppliers, as well as a violation of privacy, antitrust, or other applicable laws. If employees not usually privileged to the information as a part of their job responsibilities request that information, we should consult with the appropriate manager, Corporate Privacy, Corporate Compliance and Ethics, or Corporate or Region Legal prior to divulging the requested information.

We also should guard against unintentionally disclosing proprietary or confidential information. Situations that could result in inadvertent disclosure of sensitive information include discussing confidential or proprietary information in public—in restaurants, on elevators, or on airplanes; talking about it on public or mobile phones; working with sensitive information on laptop computers or other electronic devices in public; or transmitting such information by insecure means. Our obligation to protect UPS's confidential and proprietary information continues even after separation from the company.

81.    Under a section titled "Conflicts of Interest," the Code of Conduct states the following:

We are expected to give our undivided business loyalty to UPS when conducting our job-related duties. Accordingly, we must be careful to avoid conflicts of interest—situations where our private interests conflict or even appear to conflict with the interests of UPS as a whole. Therefore, we should not place ourselves in situations that might force us inappropriately to choose between our personal or financial interests and the interests of UPS.

Conflicts of interest can arise in many common areas despite our best efforts to avoid them. When these situations occur, a UPS employee should promptly notify his or her manager of any actual, perceived, or potential conflict of interest. The manager can then provide guidance regarding how best to remove or appropriately resolve the conflict. If needed, Corporate Compliance and Ethics or Corporate or Region Legal also may be contacted for guidance.

Certain recurrent or continuing potential conflicts of interest also must be disclosed on the annual Business Ethics Questionnaire.

Additional information about conflicts of interest, including information about investments in other companies, is available in the sections of this Code titled "Doing Business with UPS," "Investments," and "Political Activities and Contributions." Refer to the Political Activities, Guidelines, and Ethics Rules on the Corporate Compliance and Ethics website.

82.     Under a section titled "Reporting Concerns, Asking Questions, and Voicing Opinions," the Code of Conduct states the following, in relevant part:

This Code provides an overview of the legal and ethical responsibilities that we share. We must uphold these responsibilities by reporting concerns to the attention of the company so that these concerns may be reviewed and addressed in an ethical and responsible manner. Individuals who report concerns must do so without fear of reprisal. Two specific policies govern UPS's need to be aware of and respond to concerns relating to the company: "Duty to Disclose" and "No Retaliation."

**Duty to Disclose:** Any UPS employee or representative who becomes aware of a situation in which he or she believes our legal or ethical responsibilities are being violated, or feels pressured to violate the law or our ethical responsibilities, is required to notify the company of the concern.

**No Retaliation:** No employee or representative of UPS will be disciplined, lose a job or contract, or be retaliated against in any way for asking questions or voicing concerns about our legal or ethical obligations when acting in "good faith." Good faith does not mean an individual has to be right; but it does mean that the individual must believe that the information provided is truthful.

Additional information can be found in the section of this Code titled "No Retaliation" and on the Corporate Compliance and Ethics website.

It is important that questions or concerns related to the Code or alleged violations of the Code be communicated through one of the many available reporting channels.

If any aspect of the Code is unclear or if we have any questions or concerns, we should talk to our direct manager or supervisor.

83.    Under a section titled "Insider Trading," the Code of Conduct states

the following, in relevant part:

Buying or selling securities while in possession of material nonpublic information (or inside information) may violate U.S. and other securities laws.

Inside information is information that is nonpublic, or has been public only for a very short time, that a reasonable investor would consider important in making investment decisions.

Examples of inside information may include:
• Significant contracts or proposed contracts with customers or suppliers.
• Proposed acquisitions, joint ventures, or divestitures.
• New products or services and regulatory approvals or disapprovals.
• Financial performance.

Insider trading is both unethical and illegal, and we should not trade in any stock or other securities on the basis of such inside information, including inside information we learned about an organization with which UPS does or might do business.

### *Corporate Governance Guidelines*

84.    The Corporate Governance Guidelines state that the Company's shareowners elect the Board and the Board "establishes policy for the Company and provides oversight of the Company's management."

85.    Under the section titled "Board Committees," the Corporate Governance Guidelines state:

> The Board currently has five standing committees: Audit; Compensation and Human Capital; Executive; Nominating and Corporate Governance; and Risk. Committee membership, including the number and identity of directors comprising a committee and the director designated as committee chair, is determined by the full Board, acting with the recommendation of the Nominating and Corporate Governance Committee. The membership of the committees and committee chair service are rotated on a periodic basis. From time to time, the Board may provide for other standing or special committees as may assist in carrying out its responsibilities.

86.     Under a section titled "Confidentiality," the Corporate Governance Guidelines state:

> Directors must protect and hold confidential all non-public information that comes to them, from whatever source, in their capacity as a director of the Company, unless disclosure is authorized or required by law. Proceedings and deliberations of the Board and its committees are confidential.

87.     In violation of the Code of Conduct and Corporate Governance Guidelines, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Conduct, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Codes of Conduct.

# UPS'S AUDIT COMMITTEE CHARTER

88.    The Company also maintains an Audit Committee Charter (the "Audit Committee Charter"). According to the Audit Committee Charter, the purpose of the Audit Committee, *inter alia*, is as follows:

> The Committee assists the Board in discharging its responsibilities relating to the accounting, reporting and financial practices of the Company and its subsidiaries. The Committee has general responsibility for oversight of the accounting and financial reporting processes of the Company and its subsidiaries, including oversight of the Company's evaluation of major financial risks, oversight of the integrity of the Company's financial statements, the Company's systems of disclosure controls and internal controls, the Company's compliance with legal and regulatory requirements as well as the Company's Code of Business Conduct, the qualification and independence of the Company's independent auditors, the performance of the Company's internal audit function and independent auditors, and the preparation of the audit committee report that the SEC requires to be included in the Company's annual proxy statement.

89.    Under a section titled "Audit Practices and Financial Reporting Matters," the Audit Committee Charter lists the following responsibilities of the Audit Committee, in relevant part:

> 1. Meet to review and discuss with management and the independent auditors the Company's annual audited financial statements and quarterly financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and discuss with the independent auditors their judgments as to the quality of the Company's accounting principles. Recommend to the Board whether

the annual audited financial statements should be included in the Annual Report on Form 10-K.

2. Review with management and the independent auditors the results of any significant matters identified as a result of the independent auditors' interim review procedures prior to the filing of each Form 10-Q or as soon thereafter as possible. The Committee Chair may perform this function on behalf of the Committee.

3. Discuss earnings press releases and financial information and earnings guidance provided to analysts and rating agencies.

4. Review the annual program for the Company's internal audits and review audit reports submitted by the internal auditing staff. Approve the annual audit plan and all major changes to the plan.

5. Review the activities, staffing, and organizational structure of the internal audit function.

6. Review and discuss with the independent auditors and the internal auditors the adequacy, effectiveness, and integrity of the Company's financial reporting processes (both internal and external) and internal controls (including disclosure controls).

8. Review changes in the accounting policies of the Company and accounting and financial reporting proposals that may have a significant impact on the Company's financial reports, and make reports on the foregoing to the Board.

9. Regularly review with the independent auditors any audit problems or difficulties and management's response, including any restrictions on the scope of the independent auditors' activities or access to requested information and any significant disagreements with management.

90.    Under a section titled "Company Governance Policies and Compliance," the Audit Committee Charter lists the following responsibilities of the Audit Committee, in relevant part:

1. Oversee the preparation of the audit committee report that the SEC rules require to be included in the Company's annual proxy statement.

2. Establish clear policies for the Company to follow in hiring employees or former employees of the independent auditors.

3. Discuss with management policies with respect to financial risk assessment and management, including guidelines to govern the process by which major financial and accounting risk assessment and management is undertaken by the Company. Meet periodically with management to review the results of such assessments, including the Company's major financial risk exposures and steps management has taken to monitor and control such exposures.

4. Discuss with management and the Risk Committee the guidelines and policies that govern the process by which enterprise risk assessment and risk management is undertaken.

5. Review the adequacy of this Committee Charter on an annual basis and recommend any proposed changes to the Board for approval. Conduct an annual performance evaluation of the Committee.

6. Review with management and the independent auditors any correspondence with regulators or governmental agencies and any employee complaints or published reports, which raise material issues regarding the Company's financial statements or accounting policies. In connection therewith, the Committee shall establish procedures for (1) the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls, auditing or federal securities law matters, and (2) the confidential, anonymous

submission by employees of the Company of concerns regarding such questionable accounting or auditing matters.

7. Oversee the Company's Business Conduct and Compliance Program, including the Company's Code of Business Conduct, and, at least annually, meet to review the implementation and effectiveness of the Company's legal and ethical compliance programs with the Company's senior leadership, including any senior leader with day-to-day operational responsibility for compliance, who shall have the authority to communicate directly to the Committee, promptly, about actual and alleged violations of law or the Code of Business Conduct, including any matters involving criminal or potential criminal conduct.

8. Establish and periodically review policies and procedures for the review, approval and ratification of related person transactions, and review and approve or ratify, as appropriate, any related person transactions.

91.    Under a section titled "General Powers," the Audit Committee

Charter lists the following responsibilities of the Audit Committee, in relevant part:

1. Have the ability (but not the obligation) to conduct or authorize, if it considers appropriate, investigations into any matters within the scope of its responsibilities.

2. Delegate any of its responsibilities to subcommittees of one or more members of the Committee as the Committee may deem appropriate.

3. Have the authority (without the necessity or requirement of approval from the Board) to obtain advice, services and assistance from outside legal, accounting or other advisors, as the Committee deems necessary or appropriate to assist it in carrying out its responsibilities, and to determine the compensation for any such advisors. The Committee shall receive appropriate funding from the Company for payment of compensation to any such advisors and for

the payment of ordinary administrative expenses that are necessary or appropriate in carrying out the Committee's duties.

4. Perform such activities consistent with this Charter, the Company's Amended and Restated Bylaws and applicable law as the Board or the Committee deems necessary or appropriate.

5. Report regularly to the Board and make recommendations to the Board within the scope of its functions.

92.    Under a section titled "Scope of Duties," the Audit Committee Charter states:

> While the Committee has the responsibilities and the authority set forth in this Charter, it is not the duty or responsibility of the Committee to plan or conduct audits or to determine that the Company's financial statements are complete and accurate and are in accordance with GAAP. This is the responsibility of the independent auditors and management, respectively. Nor is it the duty of the Committee to assure compliance by the Company or its subsidiaries with applicable laws and regulations and the Business Conduct and Compliance Program.

93.    In violation of the Audit Committee Charter, the Individual Defendants (as key officers and members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the

Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

94.    UPS represents itself to be the "world's premier package delivery company and a leading provider of global supply chain management solutions."[3] The Company purports to "offer a broad range of industry-leading products and services through [its] extensive global presence" and represents that its services "include transportation and delivery, distribution, contract logistics, ocean freight, air freight, customs brokerage and insurance."[4]

### False and Misleading Statements

#### *January 30, 2024 Press Release & Earnings Call*

95.    On January 30, 2024, the Company issued a press release announcing its financial results for the fourth quarter and full 2023 Fiscal Year. The press

---

[3] https://www.sec.gov/ix?doc=/Archives/edgar/data/1090727/000109072724000018/ups-20240318.htm
[4] *Id.*

release also announced UPS's 2024 guidance, stating the following, in relevant part:

> For the full year 2024, UPS expects revenue to range from approximately $92.0 billion to $94.5 billion and consolidated adjusted operating margin to range from approximately 10.0% to 10.6%.
>
> The company is planning capital expenditures of about $4.5 billion and dividend payments of around $5.4 billion, subject to board approval. The effective tax rate is expected to be around 23.5%.

96.    The same day, UPS hosted an earnings call to discuss the Company's fourth quarter and full 2023 Fiscal Year financial results. During the call, Defendant Tome, the Company's CEO, discussed the Company's guidance for 2024 stating the following, in relevant part:

> In 2024, the small package market in the U.S. excluding Amazon, is expected to grow by less than 1% and projected market growth rates for the rest of our business segments suggest some improvement but not until the latter part of the year. In building our 2024 financial targets, we included the low end of our guidance on market growth. And for the high end of our guidance, included growth we should experience if we capture market share. In 2024, we expect to generate consolidated revenue ranging from approximately $92 billion to $94.5 billion and a consolidated operating margin ranging from approximately 10% to 10.6%. Given the nuances of our new labor contract, there will be stark contrast between our first half and our second half performance.
>
> ***First half earnings will be compressed and second half earnings will expand. In both the low and high end of our guidance range, we expect to exit the year with a U.S. operating margin of 10%.*** Brian will provide more details in a moment. UPS remains rock-solid

strong. While our dividend payout is currently higher than our targeted payout of 50% of our prior year's adjusted earnings per share, we are confident in our future. As a result, the UPS Board approved a $0.01 increase in the quarterly dividend from $1.62 per share to $1.63 per share.[5]

97.    Also during the call, Defendant Newman, the Company's then-CFO, continued to discuss UPS's basis for its 2024 guidance, stating:

> This is primarily driven by lapping the volume diversion we experienced in the U.S. last year during our labor negotiations. Additionally, costs will weigh on us in the first half of the year, primarily due to the high labor cost inflation associated with the new contract. Looking at consolidated revenue. In the first half of the year, we expect the growth rate to decline within a range of approximately 1% to 2%, with the first quarter driving the decline. And in the back half of the year, revenue growth is anticipated to be up within a range of mid- to high single digits. ***Looking at consolidated operating profit, we expect material improvement as the year progresses with the second half of the year outperforming the first half. Lastly, we expect to generate our lowest consolidated operating margin of the year in the first quarter.***

98.    During the question-and-answer segment of the call, Defendant Cesarone, the Company's EVP and US President, touted UPS's ability to handle volume instability, stating the following, in relevant part:

> <Q: David Scott Vernon – Sanford C. Bernstein & Co., LLC – Senior Analyst> So I just wanted to ask on the productivity side. Obviously, hours down more than volume. We've had a couple of quarters of that, obviously, now the third quarter this year. Is there a point where volume declines become more difficult to offset? I'm just trying to

---

[5] All emphasis has been added unless otherwise noted herein.

understand the downside risk, right. If volumes continue to remain flat, or weaker than you expect, how should we be thinking about the downside risk on the margin side? . . .

<A: Nando Cesarone> Yes. ***So David, for us, it is a virtuous cycle. So we're working ahead of any type of volume variability. So whether it goes up or down, we've got some of our best engineers, operations folks, finance folks identifying additional cost outs as we move forward, as we're executing the ones that we have in front of us.*** So we feel good that there's a good pipeline of opportunity no matter what the volume does. And as Carol had mentioned, we lever our hourly headcount and match that to the volume and the activity. And so far, so good but still lots in front of us and they're pretty meaty, so we feel really good about those initiatives.

99.    The statements in ¶¶95-98 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) Defendants did not have reliable information with respect to the Company's projected revenue outlook and anticipated growth; (2) Defendants were minimizing the risks facing the Company as a result of seasonality and macroeconomic fluctuations; and (3) UPS was not equipped to handle a volume surge without causing a related substantial decline in the Company's operating margin. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

***2024 Proxy Statement***

100.    On March 18, 2024, UPS filed the 2024 Proxy Statement with the

SEC, notifying shareholders of the 2024 Annual Meeting of Shareowners to be held on May 2, 2024. Defendants Tome, Adkins, Boratto, Burns, Hewett, Hwang, K. Johnson, W. Johnson, Moison, Shi, Stokes, and Warsh solicited the 2024 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

101.   The 2024 Proxy Statement solicited Company shareholders to, *inter alia*: (1) re-elect Defendants Tome, Adkins, Boratto, Burns, Hewett, Hwang, K. Johnson, W. Johnson, Moison, Shi, Stokes, and Warsh to the Board; (2) approve, on an advisory basis, the Company's named executive officer compensation; and (3) ratify the appointment of Deloitte & Touche LLP as the Company's independent registered public accounting firm for 2024.

102.   Regarding "Risk Oversight," the 2024 Proxy Statement stated the following, in relevant part:

**Board of Directors**

Risk management oversight is an essential board responsibility. The board regularly discusses our most significant risks and how these risks are being managed. The Company's enterprise risk management process is designed to identify potential events that may affect the achievement of the Company's objectives or have a material adverse effect on the Company. The board reviews periodic assessments from this process and participates in the Company's annual enterprise risk survey. The board has delegated to its standing committees specific risk oversight responsibilities as set out below and receives regular

reports from the committees on appropriate areas of risk management.

**Risk Committee**

Oversees management's identification and evaluation of strategic enterprise risks, including risks associated with intellectual property, operations, privacy, technology, information security, cybersecurity and cyber incident response, and business continuity.

**Audit Committee**

Oversees policies with respect to financial risk assessment, including guidelines to govern the process by which major financial and accounting risk assessment and management is undertaken.

**Compensation and Human Capital Committee**

Considers risks associated with compensation policies and practices, with respect to both executive compensation and compensation generally, and considers other human capital risks.

**Nominating and Corporate Governance Committee**

Considers risks related to succession planning, political contributions and lobbying, sustainability and stakeholder engagement matters, among others.

103. With respect to the Code of Conduct, the 2024 Proxy Statement stated:

**Code of Business Conduct**

We are committed to conducting our business in accordance with the highest ethical principles. Our Code of Business Conduct is applicable to anyone who represents UPS, including our directors, executive officers and all other employees and agents of UPS. A copy of our

Code of Business Conduct is available on our investor relations website at www.investors.ups.com.

104.    Under the direction and watch of Defendants Tome, Adkins, Boratto, Burns, Hewett, Hwang, K. Johnson, W. Johnson, Moison, Shi, Stokes, and Warsh, the 2024 Proxy Statement failed to disclose, *inter alia*, that: (1) Defendants did not have reliable information with respect to the Company's projected revenue outlook and anticipated growth; (2) Defendants were minimizing the risks facing the Company as a result of seasonality and macroeconomic fluctuations; and (3) UPS was not equipped to handle a volume surge without causing a related substantial decline in the Company's operating margin. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

105.   The 2024 Proxy Statement also failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and

misleading statements.

106.   As a result of Defendants Tome, Adkins, Boratto, Burns, Hewett, Hwang, K. Johnson, W. Johnson, Moison, Shi, Stokes, and Warsh causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to re-elect Defendants Tome, Adkins, Boratto, Burns, Hewett, Hwang, K. Johnson, W. Johnson, Moison, Shi, Stokes, and Warsh to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

### March 26, 2024 Analyst/Investor Day Presentation

107.   On March 26, 2024, the Company hosted its annual Analyst/Investor Day presentation. During the call, with respect to UPS's roadmap for volume and margin growth, Defendant Cesarone represented that UPS had "*a renewed focus on commercial opportunities by focusing on sectors that can drive meaningful benefits to our customers . . . We'll use also our dynamic pricing to attract volume while simultaneously enhancing our margins and balancing our demand by week and by day.*"

108.   Later during the presentation, Defendant Newman stated that in January, "we provided our 2024 consolidated revenue and operating margin targets, and we are confirming that guidance today." In discussing the prior guidance, Defendant Newman noted that Defendants "still expect[ed] negative

growth in total average daily volume and revenue in the first half of this year," and "still expect[ed] first half 2024 consolidated operating profit to be down around 20% to 30% and then rebound to be up between 20% and 30% in the second half of the year."

109.    Defendants also continued to explain their growth expectations for the Company during the question-and-answer segment of the call, stating the following, in relevant part:

> <Q: Unknown Analyst> Great. Yes. Thanks for hosting us and for all the great information. Wanted to get -- I'll give you 2 questions. So one, just on the margin targets. How sensitive are those to volume growth? So if your domestic grows 1% sort of 3% volume, can you still hit the margin target to 12%?
>
>                                     . . .
>
> <A: Brian O. Newman> So from a margin perspective, Tom, thanks for the question, there's a much heavier reliance on the RPP in terms of flow-through to profit. If you're thinking about margin in dollars, it's more 2/3 RPP, 1/3 volume. So there's a much heavier reliance on the pricing.
>
>                                     . . .
>
> <Q: Amit Singh Mehrotra – Deutsche Bank AG – Director and Senior Research Analyst> Deutsche Bank. I had a question for Carol and then Brian. So you obviously have a very bullish 2026 targets. The market, at least as it speaks today doesn't seem to believe them, if I could say it that way. And so if we sit here in March of 2027 and look back. What has to go right for you guys to deliver on these bold targets? And what do you have to go wrong or would go wrong for us to kind of revising those numbers lower?
>
> And I say that in the context of really volume because volume has been a really difficult moving target for the last couple of years for a

lot of reasons that are beyond your control. And so when we think about that $10 billion of domestic revenue growth, Brian, can you help us bifurcate between RPP and volume? Because RPP is fine, but the CPP at 1% also has volume leverage embedded in it. So it's really important for us to understand that $10 billion bifurcation between volume and price or RPP, what your confidence level is in that so that we're not 3 years from now coming back and saying, "Hey, we missed our targets on volume."

. . .

<A: Brian O. Newman> And Amit, as you think about the growth in the U.S., 5% revenue growth over the next 3 years from a U.S. perspective, very balanced, 3% in the ADV, 2.5% on the RPP. As Nando and Matt have both mentioned, the type of volume we're going after is quality revenue, whether it's SMB as we drive that up from 30% going north from a mix perspective, the commercial side, very attractive. Both those things help from a mix perspective on the RPP. Our GRI has run between 4.9% and 6.9% for over a decade. So you'll have a GRI price point that will help to drive that. ***At the end of the day, it's balancing this revenue and the profit margin and there is a big flow through on the RPP piece, we remain disciplined on the revenue per piece.***

. . .

<Q: Jeffrey Asher Kauffman – Vertical Research Partners, LLC – Partner> . . . I mean, a big piece of this is RPP exceeding CPP. You go out every year with a 4.9% to 6.9% GRI. Can you help us understand how that GRI comes down to a 2.5% growth rate on the RPP? I think as David was alluding are there mix assumptions in here. I don't think it's fuel price over a 3-year period. Just kind of help us understand how that boils down to that RPP assumption?

<A: Carol B. Tome> So – who wants to take that call?

<Unknown Executive of UPS> I'll start, Dave. So Listen, the keep rate on the GRI has been running last year about 60% this year, about 50% is the expectation. So you can take that 5.9% and have a keep

- 56 -

rate of about 5% -- 50%, excuse me to that. We have assumptions in on mix, both product and customer.

*You've had some training from air to ground going on, which applies some headwinds*. We have SMB growth, which is a bit of a tailwind. *And then you have products like SurePost that are very attractive from a margin perspective, but lower RPP, lower CPP*. So all of that is embedded into the guide of 2.5% in the U.S. over the next 3 years, and that's how we kind of came up with the model.

### April 23, 2024 Press Release and Earnings Call

110.    On April 23, 2024, the Company issued a press release announcing "first-quarter 2024 consolidated revenues of $21.7 billion, a 5.3% decrease from the first quarter of 2023." The press release also stated that "[c]onsolidated operating profit was $1.6 billion, down 36.5% compared to the first quarter of 2023, and down 31.5% on an adjusted basis" and further that "[d]iluted earnings per share were $1.30 for the quarter; adjusted diluted earnings per share of $1.43 were 35.0% below the same period in 2023."

111.    Also in the press release, the Company further reaffirmed its full-year fiscal 2024 guidance as follows:

- Consolidated revenue to range from approximately $92.0 billion to $94.5 billion
- Consolidated adjusted operating margin to range from approximately 10.0% to 10.6%
- Capital expenditures of approximately $4.5 billion

112.    During an earnings call the Company hosted the same day, Defendant

Newman spoke of the Company's volume growth and its impact on UPS's margins, stating the following, in relevant part:

> Looking at the key drivers within forwarding, market rates in international airfreight continue to drive down top line revenue. ***On the ocean side, excess market capacity continued to pressure market rates and drove a decrease in revenue despite volume growth.*** And our truckload brokerage unit continued to face soft demand and market rate pressures. Logistics delivered revenue growth and increased operating profit driven by gains in health care. In the first quarter, Supply Chain Solutions generated operating profit of $226 million, down $32 million year-over-year and an operating margin of 7%. Walking through the rest of the income statement, we had $195 million of interest expense.

113.    During the question-and-answer segment of the call, Defendants further discussed UPS's volume and margin expectations as follows:

> <Q: Eric Thomas Morgan – Barclays Bank – Analyst> This is Eric Morgan on for Brandon. I just wanted to ask about the guidance in the first half. I know you mentioned 1Q kind of coming in line with your expectations, but you did call out the 40% decline expectation at the Investor Day. ***So just wondering if anything happened late in the quarter that drove EBIT above your expectations in the first quarter? And then are there anything negative going on in 2Q that led you to maintain the first half guidance rather than raise it similar to the 1Q beat?***

> <A: Brian O. Newman> Morgan, it's Brian. Happy to take this one. ***Look, our guidance for the first half of the year remains the same, declining in profit down 20% to 30%. So that's consistent***. I did call out at the tail end of the quarter, expected minus 40%. ***I said consistently that Q1 would be the tougher quarter in the first half of the year.*** There were 2 elements that contributed to beating that 40%. One, on the top line, we did see positive volume momentum going

into theend of the quarter. In fact, the last couple of weeks were basically breakeven from a volume perspective. I think the last week was about 0% thereabout.

***So sequentially, we were seeing improved volume***. But the bigger component was just some cost trading between April and March, things like occupancy and maintenance cost shift in terms of when they hit the P&L between March and April. So no change from a guide perspective, still down 20% to 30%, some cost timing at the end of the quarter there, but the positive was the trajectory of volume momentum.

. . .

<Q: Thomas Richard Wadewitz – UBS Investment Bank – Managing Director and Senior Analyst> I wanted to see Brian or Carol, if you could walk through what are the key pieces of the 2Q versus 1Q ramp in EBIT. And then I guess the same thing for second half. Obviously, you've got Fit to Serve as a significant cost benefit 2Q versus 1Q. But I think just trying to figure out how much of the improvement sequentially is based on volume that you have visibility to and how much would be based on anticipation of improvement in the broader parcel market kind of macro improvement.

<A: Brian O. Newman> Tom, happy to take that. So listen, ***from a Q1 to Q2 perspective, the shape, if we look at the U.S., we would expect marginal growth from a volume perspective, which relative to past trends, normally, Q1 steps down to Q2 from an absolute volume level. So by maintaining that will be a natural accretion from an EBIT perspective***. The big component, though, full year on a run rate basis, the Fit to Serve program will generate $1.3 billion in savings and we're ramping that up in Q2. So that will be a big driver as well as we think about it.

And then from a Q1 to the back half of the year, it's the same 3 components, Fit to Serve. It's the volume lift along with the drivers of RPP and then it's the labor contract lapping, which is the big piece in the back end of the year.

<A: Carol B. Tome> And maybe just a few more comments on RPP since our RPP in the U.S. was flat in the first quarter. We expect to see RPP growth as we head towards the back half of the year. Why? Well, first of all, fuel prices were a drag on the RPP in the first quarter. The projection for fuel is that is going to increase. we are also announcing a fuel surcharge later today. So those 2 components of fuel will be a bonus to RPP as we head towards the back half.

We also are going to have a pretty picky peak, we anticipate for fewer operating days this year than last, which means the demand surcharge should be pretty strong this year compared to last year. ***And then we brought in a lot of SurePost product into our network. We're meeting our customers where they want to go*** we'll be anniversary-ing a lot of that in the back half of the year as well. So we don't expect-- we love SurePost by the way, but we don't expect to see the drag on the RPP I'm sure costs in the back half, like we said, in the first quarter. Any other color you'd like to provide?

<A: Brian O. Newman> I think all those that you stated, Carol, ***and then the volume growth, obviously, with the comps, it's going to be a big help to us.***

. . .

<Q: Scott H. Group – Wolfe Research, LLC – MD & Senior Analyst> Brian, the second quarter guide, I guess, implies EBIT down anywhere from 10% to 30%. So any more directional color there? And then on this revenue cost allocation thing with the post office, is there any way to just quantify what the benefit is to the U.S. margin as you're doing this? And is that already sort of captured in the 10% margin comment for Q4? Or does this now take it up versus what you previously thought?

. . .

<A: Brian O. Newman> Sure. Scott, we're maintaining the first half at negative 20% to 30% from a profit perspective. So you can choose the element of the range you want to point towards. I think ADV in domestic, we're expecting Q2 to be slightly positive. ***RPP should be consistent with what we saw flattish in the first quarter as we move out of the headwinds from a mix perspective*** . . .

114.    The statements in ¶¶107-113 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) Defendants did not have reliable information with respect to the Company's projected revenue outlook and anticipated growth; (2) Defendants were minimizing the risks facing the Company as a result of seasonality and macroeconomic fluctuations; and (3) UPS was not equipped to handle a volume surge without causing a related substantial decline in the Company's operating margin. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**The Truth Emerges**

*July 23, 2024 Press Release and Earnings Call*

115.    The truth emerged on July 23, 2024 when the Company issued a press release announcing its financial results for the second quarter of 2024. The press release disclosed financial results that fell well below consensus and UPS's prior guidance. In particular, the Company "announced second-quarter 2024 consolidated revenues of $21.8 billion, a 1.1% decrease from the second quarter of 2023. Consolidated operating profit was $1.9 billion, down 30.1% compared to the second quarter of 2023, and down 29.3% on an adjusted basis. Diluted earnings per

share were $1.65 for the quarter; adjusted diluted earnings per share of $1.79 were 29.5% below the same period in 2023."

116. In addition, the Company updated its full year 2024 guide, reducing its prior projections as follows:

> For 2024, UPS updates its full-year, consolidated financial targets:
> • Consolidated revenue expected to be approximately $93.0 billion
> • Consolidated adjusted operating margin expected to be approximately 9.4%
> • Capital expenditures of approximately $4.0 billion
> • Targeting around $500 million in share repurchases

117. During the earnings call the Company hosted the same day, Defendants attempted to explain the poor quarter and reduced guide, attributing both issues to a surge of volume growth. In relevant part, Defendants stated:

> So the **key assumptions we used to build our plan are holding with one distinction, and that's U.S. volume mix** both in terms of product and customer segmentation. During the quarter **we experienced a shift toward value products, with shippers choosing ground over air and SurePost over ground**. And there was also a notable shift in product characteristics with a surge in lightweight short volume moving in our network.
>
> . . .
>
> At the beginning of the year, we expected to see 3 things in the second quarter: volume growth, growth in B2C and relatively consistent product mix to what we had experienced last year.
>
> While we saw strong volume growth in the second quarter led by B2C, it came with a different product mix.
>
> . . .

- 62 -

From a product perspective, we saw customers trade down between services. Specifically, we saw customers shift from air to ground and from ground to SurePost. As a result, total air average daily volume was down 7.8%, while ground average daily volume increased 2.3%. Within ground, SurePost average daily volume grew 25% driven by new shippers product choices, product trade downs and easier comparisons due to last year's decline in volume during our contract negotiations. By enhancing our matching algorithm, we saw an increase in the percentage of SurePost packages redirected to UPS for delivery. As a result, SurePost Redirect increase returning to 2020 level.

. . .

Let me break down the components of the revenue per piece decline. Base rates increased the revenue per piece growth rate by 90 basis points. The combination of product mix, lighter weights and shorter zones decreased the revenue per piece growth rate by 310 basis points. The remaining point -- basis point decline in the revenue per piece growth rate was due to the combination of changes in customer mix and fuel.

118.    Later, during the question-and-answer segment of the call, Defendants continued to discuss UPS's volume growth and its impact to margins. The discussion was as follows:

<Q: Thomas Richard Wadewitz – UBS Investment Bank – Managing Director and Senior Analyst> I wanted to see if you could offer some more thoughts on what's happening with domestic package volume and the mix effect. If I look at the core ground, so excluding SurePost, it looks like you saw a decline sequentially. So let's say, 12.3 million pieces a day in 1Q to 11.7 million if I exclude SurePost. So do you think -- is that just market weaker? Or is that kind of competitive performance? So just wanted to see if you could offer more thoughts on what's happening in domestic package volume. And then maybe why -- what are key levers to see that mix performance improve as we look at second half?

- 63 -

<A: Brian Dykes> Thanks, Tom, for the question. I think when you look at the domestic volume performance from the second quarter and then going forward, in the second quarter, there was really two big impacts that were driving the change. **One is we did see customers favoring our more economical products, so going** from air to ground, and within ground, from ground to SurePost. And that was across the broad base of customers. **We also saw an acceleration of new entrants, new e-commerce customers that were coming into the market that are, quite frankly, running a different model than our traditional customers and are highly leveraging our SurePost product. So we saw an acceleration of SurePost.**

The growth rate is also complicated as you think about what happened in the second quarter of last year because of the type of customers that diverted early. As we were approaching the Teamster contract, it does also skew the growth rate. As we move forward and you see -- you can see it in our forecast and within the guide, that we do expect that mix to rationalize as we move towards the end of the year. And we've got line of sight to that in our pipeline and are working to actively pull those through as we kind of balance the mix of products going into the second half.

<A: Carol B. Tome> And maybe a couple of other comments about just the volume. **As you saw, our commercial business was down year-on-year, although the rate of decline has moderated greatly. As we look to the back half of the year, we expect that to improve.** Our pipeline is quite robust. So we expect to see good movement in that space.

. . .

<Q: Ravi Shanker – Morgan Stanley – MD & Lead Analyst> Two-parter, if I may, please. Given -- I mean, you've done a pretty good job of kind of managing your largest customer in terms of size. **Will you be looking to also meter the growth from these new e-commerce customers as part of better, not bigger if the mix is not being helpful?** And second question is, can you help us dimension the size

of returns in your operation either in terms of volume or revenue, please?

<A: Carol B. Tome> So first, in terms of our largest customer, we have a very good relationship with that customer, and the revenue for the quarter was at 11.5% of total revenue, so about the same as it was a year ago. And we look forward to continuing to optimizing the relationship we had with that custome**r. *In terms of the new e-commerce entrants that have come into our network, we are focused on serving the segments of the opportunities that really respect our end-to-end network, and we will continue to do that*.

. . .

<Q: David Scott Vernon – Sanford C. Bernstein & Co., LLC – Senior Analyst> So Carol, when you came in, there was a lot of focus on value over volume. But here we are guiding down the back half on really easy comps through growth in lower-value volume. Has something changed to your focus for the company? Like what should investors take away from this sort of -- what seems like a pivot towards chasing volume again?

<A: Carol B. Tome> Yes. So we're not chasing volume. ***We actually accepted new customers into our network of certain volume expectations that blew up on us. We're not chasing it. It's just their demand was much higher than we had anticipated.*** And so we are laser-focused, focusing on the segments of the market that value our end-to-end network. Better not bigger has not gone away. ***We'll be managing through this. We need to manage through it and we will be managing through it.*** So don't read anything into this other than we had new customers come in to our network whose volume blew up. And we were able to serve that with the best on-time service of any carrier.

. . .

<Q: David Scott Vernon – Sanford C. Bernstein & Co., LLC – Senior Analyst> So I mean, I guess, I appreciate that. But when you think about the guidance you just gave for 3Q being 10% to 15% off a really low base, it just doesn't seem like it's dropping to the bottom line. And that's what investors are looking to capitalize your earnings, not necessarily productivity or cost per piece growth.

- 65 -

<A: Carol B. Tome> Yes. No, we appreciate that. We do. ***There are a number of actions that we can take to address this. But we thought it was important to provide guidance today***. It's that the most realistic view of the back half of the year. It doesn't mean that this is the future of our company. In fact, as we mentioned, we will exit the U.S. with a 10% operating margin. That's a significant change from where we have been.

119.   On this news, the price per share of UPS's stock fell $17.50, or approximately 12%, from a closing price of $145.18 per share on July 22, 2024 to close at a price of $127.68 per share on July 23, 2024.

## DAMAGES TO UPS

120.   As a direct and proximate result of the Individual Defendants' conduct, UPS has lost and expended, and will continue to lose and expend, many millions of dollars.

121.   Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

122.   Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on any

other misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

123. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

124. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

125. As a direct and proximate result of the Individual Defendants' conduct, UPS has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock price in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

126. Plaintiff brings this action derivatively and for the benefit of UPS to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of UPS, unjust enrichment, abuse of control, gross mismanagement, waste of corporate

assets, and violations of the Exchange Act.

127.    UPS is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

128.    Plaintiff is, and has been at all relevant times, a shareholder of UPS. Plaintiff will adequately and fairly represent the interests of UPS in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY

129.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

130.    A pre-suit demand on the Board is futile and, therefore, excused. At the time of the commencement of this action, the Board consisted of the following twelve individuals: Defendants Tome, Adkins, Boratto, Burns, Hewett, Hwang, K. Johnson, W. Johnson, Moison, Shi, Stokes, and Warsh (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to six of these twelve Director-Defendants.

131.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability

as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

132. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in the scheme to make and/or cause the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and demand upon them is futile, and thus excused.

133. Additional reasons that demand on Defendant Tome is futile follow. Defendant Tome has served as the Company's CEO since June 2020 and as a Company director since 2003. She also serves as a member of the Executive Committee. As such, the Company provides Defendant Tome with her principal occupation for which she receives lucrative compensation. Thus, as the Company

admits, she is a non-independent director. As UPS's CEO and as one of its trusted directors, Defendant Tome was ultimately responsible for all of the false and misleading statements and omissions that were made by or on behalf of the Company during the Relevant Period, including those which she personally made. As a trusted Company director, Defendant Tome conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, Defendant Tome solicited the 2024 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of the Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to UPS. Moreover, Defendant Tome is named as a defendant in the Securities Class Action. For these reasons, Defendant Tome breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

134.    Additional reasons that demand on Defendant Adkins is futile follow. Defendant Adkins has served as a Company director since 2013. He also serves as Chair of the Risk Committee and as a member of the Compensation and Human

Capital Committee and the Executive Committee. Defendant Adkins has received and continues to receive lucrative compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Adkins solicited the 2024 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of the Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to UPS. For these reasons, Defendant Adkins breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

135.   Additional reasons that demand on Defendant Boratto is futile follow. Defendant Boratto has served as a Company director since 2020. She also serves as Chair of the Audit Committee. Defendant Boratto has received and continues to receive lucrative compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of scheme to cause the Company to make false and misleading statements, consciously disregarded her

duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, Defendant Boratto solicited the 2024 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of the Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to UPS. For these reasons, Defendant Boratto breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

136.   Additional reasons that demand on Defendant Burns is futile follow. Defendant Burns has served as a Company director since 2005. He also serves as a member of the Audit Committee. Defendant Burns has received and continues to receive lucrative compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Burns solicited the 2024 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of the Director-Defendants to the Board, thereby allowing them to continue breaching their

fiduciary duties to UPS. For these reasons, Defendant Burns breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

137.   Additional reasons that demand on Defendant Hewett is futile follow. Defendant Hewett has served as a Company director since 2020. He also serves as a member of the Audit Committee. Defendant Hewett has received and continues to receive lucrative compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Hewett solicited the 2024 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of the Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to UPS. For these reasons, Defendant Hewett breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

138.   Additional reasons that demand on Defendant Hwang is futile follow. Defendant Hwang has served as a Company director since 2020. She also serves as

a member of the Audit Committee. Defendant Hwang has received and continues to receive lucrative compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, Defendant Hwang solicited the 2024 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of the Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to UPS. For these reasons, Defendant Hwang breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

139.   Additional reasons that demand on Defendant K. Johnson is futile follow. Defendant K. Johnson has served as a Company director since 2020. She also serves as a member of the Risk Committee and the Nominating and Corporate Governance Committee. Defendant K. Johnson has received and continues to receive lucrative compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of scheme to cause

the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, Defendant K. Johnson solicited the 2024 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of the Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to UPS. For these reasons, Defendant K. Johnson breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

140.    Additional reasons that demand on Defendant W. Johnson is futile follow. Defendant W. Johnson has served as a Company director since 2009. He also serves as Chair of the Nominating and Corporate Governance Committee and as a member of the Executive Committee. Defendant W. Johnson has received and continues to receive lucrative compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, Defendant W. Johnson solicited the 2024 Proxy

Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of the Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to UPS. For these reasons, Defendant W. Johnson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

141.    Additional reasons that demand on Defendant Moison is futile follow. Defendant Moison has served as a Company director since 2017. He also serves as a member of the Nominating and Corporate Governance Committee and the Risk Committee. Defendant Moison has received and continues to receive lucrative compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Moison solicited the 2024 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of the Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to UPS. For these reasons, Defendant Moison breached his

fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

142.    Additional reasons that demand on Defendant Shi is futile follow. Defendant Shi has served as a Company director since 2018. She also serves as Chair of the Compensation and Human Capital Committee and as a member of the Risk Committee. Defendant Shi has received and continues to receive lucrative compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, Defendant Shi solicited the 2024 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of the Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to UPS. For these reasons, Defendant Shi breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

143.    Additional reasons that demand on Defendant Stokes is futile follow. Defendant Stokes has served as a Company director since 2020. He also serves as a

member of the Compensation and Human Capital Committee and the Nominating and Corporate Governance Committee. Defendant Stokes has received and continues to receive lucrative compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Stokes solicited the 2024 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of the Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to UPS. For these reasons, Defendant Stokes breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

144.   Additional reasons that demand on Defendant Warsh is futile follow. Defendant Warsh has served as a Company director since 2012. He also serves as a member of the Nominating and Corporate Governance Committee and the Compensation and Human Capital Committee. Defendant Warsh has received and continues to receive lucrative compensation for his role as a director as described

above. As a trusted Company director, he conducted little, if any, oversight of scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Warsh solicited the 2024 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of the Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to UPS. For these reasons, Defendant Warsh breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

145.    Additional reasons that demand on the Board is futile follow.

146. Defendants Boratto (as Chair), Burns, Hewett, and Hwang (collectively the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the

dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

147.    In violation of the Code of Conduct, the Director-Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Director-Defendants violated the Code of Conduct by failing to act with integrity, failing to avoid conflicts of interest, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Conduct and the law. Thus, the Director-Defendants breached the Company's own

Code of Conduct, are not disinterested, and demand is excused as to them.

148.   UPS has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against the Individual Defendants or any others who were responsible for that wrongful conduct to attempt to recover for UPS any part of the damages UPS suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

149.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

150.   The acts complained of herein constitute violations of fiduciary duties owed by UPS's officers and directors, and these acts are incapable of ratification.

151. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of UPS. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of UPS, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

152. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause UPS to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

153.  Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least six of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

154.  Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

155.  Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

156.  Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or

misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

157.   Under the direction and watch of Defendants Tome, Adkins, Boratto, Burns, Hewett, Hwang, K. Johnson, W. Johnson, Moison, Shi, Stokes, and Warsh, the 2024 Proxy Statement failed to disclose, *inter alia*, that: (1) Defendants did not have reliable information with respect to the Company's projected revenue outlook and anticipated growth; (2) Defendants were minimizing the risks facing the Company as a result of seasonality and macroeconomic fluctuations; and (3) UPS was not equipped to handle a volume surge without causing a related substantial decline in the Company's operating margin. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

158.   The 2024 Proxy Statement also failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these

functions and were causing or permitting the Company to issue false and misleading statements.

159.   In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2024 Proxy Statement, including, but not limited to, the election of the Company's directors.

160.   As a result of the material misstatements and omissions contained in the 2024 Proxy Statement, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Tome, Adkins, Boratto, Burns, Hewett, Hwang, K. Johnson, W. Johnson, Moison, Shi, Stokes, and Warsh to the Board, thereby allowing them to continue breaching their fiduciary duties to UPS; and (2) approve the selection of Deloitte & Touche LLP as UPS's independent registered public accounting firm for its fiscal year 2024.

161.   The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2024 Proxy Statement.

162.   Plaintiff, on behalf of UPS, has no adequate remedy at law.

**SECOND CLAIM**
**Against the Individual Defendants for Breach of Fiduciary Duties**

163.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

164.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of UPS's business and affairs.

165.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

166.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of UPS.

167.   Moreover, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements about UPS's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading

statements to the investing public that failed to disclose, *inter alia*, that: (1) Defendants did not have reliable information with respect to the Company's projected revenue outlook and anticipated growth; (2) Defendants were minimizing the risks facing the Company as a result of seasonality and macroeconomic fluctuations; and (3) UPS was not equipped to handle a volume surge without causing a related substantial decline in the Company's operating margin. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

168.  In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact alleged herein, which renders them personally liable to the Company for breaching their fiduciary duties.

169.  Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

170.  The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted

with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of UPS's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

171.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

172.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, UPS has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

173.    Plaintiff, on behalf of UPS, has no adequate remedy at law.

### THIRD CLAIM
**Against the Individual Defendants for Unjust Enrichment**

174.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

175.    By their wrongful acts, violations of law, and false and misleading

statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, UPS.

176.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from UPS that was tied to the performance or artificially inflated valuation of UPS, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

177.    Plaintiff, as a shareholder and representative of UPS, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

178.    Plaintiff, on behalf of UPS, has no adequate remedy at law.

## FOURTH CLAIM
### Against the Individual Defendants for Abuse of Control

179.  Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

180.  The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence UPS, for which they are legally responsible.

181.  As a direct and proximate result of the Individual Defendants' abuse of control, UPS has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, UPS has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

182.  Plaintiff, on behalf of UPS, has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

183.  Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

184.  By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their

responsibilities and fiduciary duties with regard to prudently managing the assets and business of UPS in a manner consistent with the operations of a publicly held corporation.

185.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, UPS has sustained and will continue to sustain significant damages.

186.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

187.   Plaintiff, on behalf of UPS, has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

188.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

189.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused UPS to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, and to lose assets from investors and customers who no longer trust the Company.

190.   As a result of the waste of corporate assets, the Individual Defendants

are each liable to the Company.

191.  Plaintiff, on behalf of UPS, has no adequate remedy at law.

## SEVENTH CLAIM
**Against Defendant Tome, Defendant Newman, and Defendant Cesarone for Contribution Under Sections 10(b) and 21D of the Exchange Act**

192.  Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

193.  UPS and Defendants Tome, Newman, and Cesarone are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Tome's, Defendant Newman's, and Defendant Cesarone's willful and/or reckless violations of their obligations as officers of UPS.

194.  Defendants Tome, Newman, and Cesarone, because of their positions of control and authority as officers of UPS, were able to and did, directly, and/or indirectly, exercise control over the business and corporate affairs of UPS, including the wrongful acts complained of herein and in the Securities Class Action.

195.  Accordingly, Defendants Tome, Newman, and Cesarone are liable under 15 U.S.C § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

196.  As such, UPS is entitled to receive all appropriate contribution or indemnification from Defendants Tome,  Newman, and Cesarone.

## REQUEST FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of UPS, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to UPS;

(c)    Determining and awarding to UPS the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing UPS and the Individual Defendants to take all necessary

actions to reform and improve UPS's corporate governance and internal procedures to comply with applicable laws and to protect UPS and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking the following actions as may be necessary to ensure proper corporate governance policies:

1.   a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.   a provision to permit the shareholders of UPS to nominate at least six candidates for election to the Board; and

3.   a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)   Awarding UPS restitution from the Individual Defendants, and each of them;

(f)   Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)   Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: November 8, 2024

**WEBB, KLASE & LEMOND, LLC**

*/s/ G. Franklin Lemond, Jr.*
E. Adam Webb
  Georgia Bar No. 743910
G. Franklin Lemond, Jr.
  Georgia Bar No. 141315
1900 The Exchange, S.E.
Suite 480
Atlanta, Georgia 30339
Telephone: (770) 444-9594
Email: adam@webbllc.com
       franklin@webbllc.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: shashmi@thebrownlawfirm.net

*Counsel for Plaintiff*